UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| BARON D. MITCHELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO. 2:08-cv-230-RLY-WGH |
| | ) | |
| PLUMBERS AND STEAMFITTERS | ) | |
| LOCAL UNION NO. 157 and | ) | |
| SYCAMORE ENGINEERING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT PLUMBERS AND STEAMFITTERS LOCAL UNION NO. 157'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Plumbers and Steamfitters Local Union No. 157 ("Local 157" or the

"Union") has moved, pursuant to Federal Rule of Civil Procedure 56, for summary

judgment as to all counts of the First Amended Complaint for Damages and Injunctive

Relief filed by the Plaintiff, Baron Mitchell.  The Union submits this Memorandum of

Law in Support of its Motion for Summary Judgment.

I.     <u>INTRODUCTION</u>

Baron Mitchell seeks to attach liability to the Union for acts of racial harassment

allegedly committed at the workplace by his co-workers, who also happen to be fellow

members of Local 157.  Mitchell contends that the Union took no steps to prevent further

acts of harassment after these issues were brought to its attention.  As a factual matter,

Mitchell's argument – that the Union did nothing in order to correct and stop further acts

of racial harassment – is contrary to the evidence.  The Union's business manager, Michael Pleasant, and its business agent, Donald Ritter, were actively involved in meeting with Mitchell, his employers, his co-workers, and fellow Union members, all in an effort to address Mitchell's concerns.  Indeed, the uncontradicted evidence establishes that Mitchell himself was initially satisfied with the Union's efforts on his behalf.

Mitchell's claims, both under 42 U.S.C. § 1981 and his supplemental state law claim that the Union breached its bylaws, are also legally insufficient even viewing his allegations in the light most favorable to him.  As to Section 1981, even if the Union had taken no steps to correct the alleged racial harassment, it cannot be held liable as a matter of law under controlling Seventh Circuit precedent.  In *Equal Employment Opportunity Commission v. Pipefitters Assoc., Local Union 597*, 334 F.3d 656 (7th Cir. 2003), the Court held that a Union has no affirmative duty under either Section 1981 or Title VII to prevent racial harassment or other forms of unlawful discrimination in the workplace.  *Id.* at 661.  The Court concluded that it is the employer, not a union, that is responsible for ensuring that a workplace is free from acts of racial harassment or discrimination.  A union simply lacks the authority to correct such issues, and therefore, cannot be held liable for failing to take steps to correct them.  *Id.* at 660-61.

Furthermore, Mitchell has identified no evidence, either direct or indirect, that would support any claim that the Union engaged in some *affirmative* act of racial harassment or discrimination against him.  The evidence reveals that the Union dealt with

2

Mitchell in the same manner that it deals with all complaints brought to its attention by members, irrespective of their race.  Mitchell's complaints were investigated and an attempt was made to resolve them to Mitchell's satisfaction.

Mitchell's state law claim – that the same acts and/or omissions that form the basis of his Section 1981 claim also constitute a breach of contract between Mitchell and the Union, specifically the bylaws of Local 157 – also fails as a matter of law because (1) Mitchell failed to exhaust the rights and remedies available to him under the very same bylaws, contrary to Ind. Code § 22-7-2-1; and (2) the alleged acts of racial discrimination and harassment at the workplace do not establish that the Union failed to comply with the bylaws.  Alternatively, Mitchell's state law claim should be dismissed once the federal Section 1981 claim falls out, so that Mitchell can pursue that claim in state court.

## II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

For purposes of this motion for summary judgment, Local 157 agrees that the following facts are not in dispute.[1]

Local 157 is a labor organization headquartered in Terre Haute, Indiana.

---

[1] Mitchell alleges that several different acts of racial harassment occurred at two different job sites, while working for two different employers.  There are factual disputes regarding whether some of these acts took place, whether they were committed by Local 157 members, and/or whether they were racially motivated.  There are also some disputes regarding the suggestions business manager Mike Pleasant gave to Mitchell in order to deal with these issues.  Solely for purposes of this motion for summary judgment, Local 157 accepts Mitchell's version of the events and recites his factual allegations regarding these incidents in its Statement of Material Facts Not in Dispute.  Local 157 reserves the right to dispute any of these factual allegations to the extent that Mitchell files his own motion for summary judgment.

(Amended Complaint ¶ 3; Answer ¶ 3).  Local 157's members primarily work as pipefitters and plumbers for employers engaged in the construction industry.  Baron Mitchell is a member of Local 157, and has been since 2003.  (Amended Complaint ¶¶ 1, 4; Answer ¶ 1, 4).  Mitchell worked as an apprentice from approximately 2003, until becoming a journeyman in approximately 2008.  (Amended Complaint ¶ 1; Answer ¶ 1). Mitchell is African-American.  (Amended Complaint ¶ 2; Answer ¶ 2).

As both an apprentice and a journeyman, Mitchell was referred to employers by Local 157 through its referral system, including both Sycamore Engineering ("Sycamore") and Babcock & Wilcox ("Babcock").  (Mitchell Dep. 10-11, 23, 28).  It is commonplace in the unionized construction industry for members to work for multiple employers.  Mitchell is a pipefitter.  (Mitchell Dep. 28).  During the five-year period of his apprenticeship, Mitchell never experienced any problems that he perceived as racially discriminatory while in apprenticeship school.  (Mitchell Dep. 31).  Indeed, Mitchell testified regarding one incident in which he complained to the apprenticeship director that another apprentice was making jokes he found offensive at a jobsite, and the apprenticeship director called that apprentice in and the jokes stopped.  (Mitchell Dep. 36-37).

In August of 2005, Mitchell began working as an apprentice for Sycamore at various jobsites, including a Pfizer plant in Terre Haute.  (Mitchell Dep. 41 and Defendant's Dep. Ex. A).  Mitchell worked for Sycamore, with and among other

members of Local 157, without incident until approximately October or November of 2006. (Mitchell Dep. 45). At that time, Mitchell was working with two caucasian journeyman pipefitters named Mike Burt and Dan Lindsay at the Pfizer jobsite.[2] (Mitchell Dep. 46-47, Plaintiff's Dep. Ex. 1). Burt and Lindsay allegedly told Mitchell that they needed him to go get a rope, and when he went to pick up the rope it was tied into a noose. (Mitchell Dep. 47-48). When Mitchell returned with the rope, Lindsay was smiling and laughing and said, "Aww, you got the rope that was meant for you." *Id.* Burt said nothing. *Id.*

Mitchell did not immediately report this incident to either his supervisor or to the Union's business manager. (Mitchell Dep. 48-49). Mitchell only reported it later (perhaps a month or more later, in December of 2006), first to an African-American co-worker named Clarence Bell, and then to Sycamore manager J.D. Smothers, after Mitchell was called into a meeting and asked about it. (Mitchell Dep. 50-51). Smothers called the meeting with Mitchell to investigate his allegations after they had been brought to his attention by Bell. (Mitchell Dep. 55-56; Smothers Dep. 36, 39). At the conclusion of this meeting, Smothers told Mitchell that if he had any more problems of this nature, to come to him directly with them. (Mitchell Dep. 56).

Mitchell claims that after the meeting with Smothers, some of the other guys at the job site were running around, dancing, saying "Ooga booga," and "trying to act funny"

---

[2] There were approximately sixty (60) to seventy (70) Local 157 members working at the Pfizer jobsite in December of 2006. (Smothers Dep. 21).

with Mitchell.  *Id.*  Mitchell also claims that after the meeting, Burt called him a "nigger" as he was walking to get parts.  (Mitchell Dep. 51).  After Burt allegedly used this racial slur, Mitchell went to Smothers and asked him to call Local 157 business manager, Mike Pleasant, so that he could come to the job site to get the matter resolved.  (Mitchell Dep. 51-52).  Mitchell also called Pleasant himself, asking him to come out and "settle the problems" he was having.  (Mitchell Dep. 51-52, 60-61).  As business manager, Pleasant was the highest ranking official at the Union.  (Meskimen Aff., Ex. A, p. 4).

Pleasant came to the jobsite to investigate and deal with these issues within the next 24 to 48 hours.  (Mitchell Dep. 60-61).  Pleasant met with Mitchell, Smothers, and Burt, and Mitchell told Pleasant about the noose incident and Burt calling him a "nigger." (Mitchell Dep. 63-64; Pleasant Dep. 52-53).  According to Mitchell, Pleasant told him that he did not want him to have any problems, and suggested that he stay at the Pfizer job and ignore anything Burt, Lindsay or anyone else said.  (Mitchell Dep. 61, 64-65).  When questioned by Pleasant and Smothers, Burt denied having called Mitchell a "nigger" and he denied knowledge of who had created the noose.  (Pleasant Dep. 52-53).  Pleasant told Burt that racial remarks would not be tolerated, and he further indicated in the meeting with Sycamore officials that Local 157 would support Sycamore taking disciplinary action against any of its employees found to be engaged in inappropriate conduct or words.  (Local 157 Answers to Interrogatories No. 2).

Smothers investigated Mitchell's allegations by looking for the noose himself and

questioning some of the employees. (Smothers Dep. 44-45). Smothers also called the job foremen – including Dan Lindsay – and Mike Burt to a meeting to tell them that the tying of nooses or other racial comments would not be tolerated. (Smothers Dep. 40-41, Plaintiff's Dep. Ex. 1). Following this investigation, Sycamore also distributed a copy of its harassment policy to employees at the Pfizer jobsite, indicating that all forms of harassment, including racial harassment, are prohibited. (Smothers Dep. 45-46, Plaintiff's Dep. Ex. 2). Employees at the Pfizer jobsite, including Local 157 members, were required to sign this document acknowledging their receipt of it. *Id.*

Smothers also offered to transfer Mitchell away from the Pfizer jobsite to a different Sycamore construction project. (Mitchell Dep. 65-66). Mitchell initially declined the offer, but several days later approached Smothers and asked to transfer. (Mitchell 66-67). Mitchell voluntarily chose to move to this jobsite, and did not disagree with the transfer at the time. (Mitchell Dep. 65-67). Mitchell continued working for Sycamore without incident until March of 2007, at which time he was laid off as a result of a reduction in force. (Mitchell Dep. 71).

Mitchell now claims he was not satisfied with the resolution of this issue at Sycamore. (Mitchell Dep. 56-57). Mitchell claims he asked Pleasant and Smothers to move both Lindsay and Burt to another jobsite, and that they should have been moved rather than him. (Mitchell Dep. 57-58, 63-64). It is undisputed that Mitchell never filed a grievance under the collective bargaining agreement with Sycamore regarding any of

these incidents.  (Mitchell Dep. 70; Pleasant Dep. 18).  Likewise, it is undisputed that

Mitchell never asked anyone with the Union to file a grievance on his behalf.  *Id.*

Mitchell knew there was a Union steward at the Pfizer job site, but did not ask a steward

to file a grievance for him.  (Mitchell Dep. 70-71).  Indeed, Pleasant never heard from

Mitchell about this issue again and believed the matter had been resolved to Mitchell's

satisfaction.  (Local 157 Answers to Interrogatories No. 2).

     Following his layoff from Sycamore, Mitchell was referred to work for Babcock in

June of 2007 at the Cayuga Generating Station project, a large project with many

pipefitters and other construction workers.  (Mitchell Dep. 84, Defendant's Dep. Ex. A).

On July 7, Mitchell was working with a caucasian pipefitter named Mark Grunner.

(Mitchell Dep. 87, 95).  An employee of another company approached Mitchell and

Grunner as they were working together, and asked Grunner about their work conditions,

to which Grunner responded that they were working them (meaning Mitchell and

Grunner) as hard as "niggers."  (Mitchell Dep. 87-88).  Mitchell did not immediately say

anything to Grunner about his use of the term.  (Mitchell Dep. 89).

     Grunner apparently realized that what he had said was inappropriate, and he

apologized to Mitchell.  (Mitchell Dep. 90-91).  In making his apology, Grunner repeated

the term "nigger," saying, "I am sorry that my parents raised me to be a racist," and "why

is it that black people can call each other 'nigger' but white people can't call black

people, 'nigger.'"  (Mitchell Dep. 86, 90-91).  Mitchell felt like Grunner was repeating

the word to "push his buttons," so Mitchell put his tools down, found his foreman Don Dougherty, and reported it. (Mitchell Dep. 93). Mitchell asked to speak with the general foreman, the superintendent, and the Union steward on the job, Mark Lindley. (Mitchell Dep. 93-94).

Lindley arrived at the meeting first, and told Mitchell he should accept Grunner's apology, forget it happened, and not try to take his job from him because they are all Union brothers. (Mitchell Dep. 95-96). Mitchell told Lindley that he did not have to accept Grunner's apology, and further expressed his opinion that he did not trust Lindley and heard he did not do his job as a Union steward. (Mitchell Dep. 96-97). Mitchell did not ask Lindley to take any action on his behalf. (Mitchell Dep. 97). Mitchell then reported Grunner's comments to Babcock management with Lindley present.

The next day, Babcock's superintendent Kevin Armstrong apologized for what had happened and told Mitchell this would not be tolerated. (Mitchell Dep. 98-99). Mitchell was told that there would be a meeting with all pipefitters and supervisors to review the Babcock harassment and discrimination policies. (Mitchell Dep. 115). Mitchell was also told that Grunner was being fired, and that this was not going to happen anymore. (Mitchell Dep. 98-99). Before this meeting began a co-worker named Ara Jones, who was a friend of Grunner, yelled at Mitchell to stay away from him, and not to speak with him because of what Mitchell had done to one of his Union brothers. (Mitchell Dep. 107-08).

After this meeting, Mitchell went to the break trailer and opened his lunch box.

He found it wet, and that it smelled of urine. (Mitchell Dep. 102-03). Mitchell was told by a co-worker that somebody had written "nigger" on the table by his lunchbox, but the word had been marked out by the co-worker so that Mitchell would not see it. (Mitchell Dep. 103). Mitchell then reported this incident to Babcock managers, after which Babcock gave Mitchell three days off with pay. (Mitchell Dep. 97). This was not disciplinary action against Mitchell but rather for his benefit to provide time to resolve any problems. (Mitchell Dep. 98).

On July 11, a meeting was held with Mitchell, Babcock management, and Local 157 business agent, Donnie Ritter. (Mitchell Dep. 97-98). Mitchell had not asked that a Union representative be present. (Mitchell Dep. 110). Ritter had been contacted by Union steward Lindley about the issue, and Ritter promptly went to the jobsite to investigate. (Local 157 Answers to Interrogatories No. 2). Ritter spoke to Grunner, who admitted having used the word "nigger," but who claimed not to have directed it to Mitchell and stated that he had apologized repeatedly. *Id.*

Mitchell was told by Babcock management at the July 11 meeting that Grunner was being brought back to work, and that he and Grunner were being separated on a different crew so there would be no additional problems. (Mitchell Dep. 112). Ritter asked Mitchell after the meeting whether Mitchell was satisfied with this, and Mitchell reported that he was. (Local 157 Answers to Interrogatories No. 2).

On July 12, Mitchell's first day back at work, he approached Babcock manager

Armstrong again, asking him to smell his lunchbox.  (Mitchell Dep. 116).  After Armstrong refused, Mitchell went to the parking lot to call a Mr. Burgess with Duke Energy (owner of the Cayuga Plant) to file a complaint with Duke.  (Mitchell Dep. 116-17).  Later that day, Union steward Mark Lindley approached Mitchell and told him that Babcock was terminating him for using his cell phone during work hours.  (Mitchell Dep. 117-18).

The same day, Mitchell called Mike Pleasant to tell him that he had been fired. (Mitchell Dep. 118).  Mitchell asked Pleasant to get him a job, and Local 157 immediately referred him out to a new employer.  (Mitchell Dep. 120-21).  Mitchell began working for the new employer within days.  (Mitchell Dep. 120-22).  Mitchell did not file a grievance against Babcock as permitted by the collective bargaining agreement, nor did he ask anyone with the Union to file a grievance for him.  (Mitchell Dep. 118-19; Pleasant Dep. 18).

Mitchell filed an EEOC charge against Babcock arising out of these incidents but did not file such a charge against Local 157.  (Mitchell Dep. 122-23).  Mitchell met with Pleasant approximately 3 weeks after he was fired by Babcock.  (Pleasant Dep. 26-27). Other than making general requests to Mike Pleasant for help dealing with these issues, Mitchell could not identify anything specific he asked the Union to do for him in connection with either the situation at Sycamore or at Babcock.  (Mitchell Dep. 126-27).

Although Mitchell did not request this at the time, he now wants Local 157 to have

the employees who engaged in the acts of racial harassment removed from their jobs. (Mitchell Dep. 130). Mitchell also claims the Union did not represent him in connection with getting his job back at Babcock, although he concedes that the Union immediately referred him to another employer at his request. (Mitchell Dep. 132-33).

Mitchell never filed any official complaint with the Union regarding his allegations of racial discrimination. (Pleasant Dep. 22-23). Mitchell never filed an internal Union charge against any member, although the bylaws of Local 157 give him the right to do so. (Pleasant Dep. 32). After both the Pfizer and Babcock incidents, Pleasant informed Mitchell he could file a grievance, or file Union charges, but Mitchell responded that he did not want to do either one. (Pleasant Dep. 27-28, 33-34, 53-54). Local 157's practice is to require a member to request in writing that a grievance be filed on his behalf. (Pleasant Dep. 85-86). Grievances are quite rare in Local 157, with only four (4) to five (5) of them having been filed during the 4 ½ year tenure of business manager Pleasant, and only then at the request of the Union member personally affected. (Pleasant Dep. 97-98).

Local 157 has adopted Laws and By-Laws. (Pleasant Dep. 29-31). Among the provisions of the By-Laws is Section 27, which states:

> **Section 27.** Grievance of Members or Officers: Any member or officer of the Local Union who feels that he has been unjustly treated or discriminated against by another member or officer of the Local Union in connection with Local Union business may bring a complaint against such member or officer. Such complaints shall be brought to the Executive Board for their consideration and action. In the event the member or officer

does not agree with the action of the Executive Board he may appeal to the
membership at a regular meeting.  If the membership concurs in the action
of the Executive Board, the grievance shall be considered settled as
determined by the Executive Board.  If the membership fails to concur in
the action of the Executive Board, the complaint shall be dropped.  No
officer or member shall be discriminated against for processing any
complaint or grievance in the manner described hereunder.

(Meskimen Aff., Ex. A, p. 14).  Furthermore, Section 28 of the By-Laws permits a

member to file charges against a fellow member "who breaks any of the working rules or

agreements of the Local Union," and if the charge is accepted by the membership at a

union meeting, the charged member must be given notice of the charge and a hearing

before the Executive Board.  (Meskimen Aff., Ex. A, pp. 14-15; Pleasant Dep. 94-95).

Following this notice and hearing, the member, if found guilty of the charge, may be

"assessed, suspended, expelled or otherwise disciplined," although any such penalty must

be consistent with the United Association Constitution.[3]  *Id.*  The practice at Local 157 is

for members to file charges on their own based upon their personal knowledge, and

during Pleasant's tenure as business manager only two (2) such charges were ever filed.

(Pleasant Dep. 32, 93-96).  The officers of Local 157 do not file charges on behalf of one

member against another member, where they lack personal knowledge, particularly where

there is a dispute regarding the factual allegations.  *Id.*

Even if a member is expelled from membership, the Union is required to refer a

---

[3]  The United Association of Journeyman and Apprentices of the Plumbing and Pipe
Fitting Industry of the United States and Canada ("United Association") is the international union
with which Local 157 is affiliated.

non-member to employers for work pursuant to its hiring hall's non-discrimination policy. (Pleasant Dep. 96).

III.    <u>ARGUMENT</u>

    **A.    Standard of Review**

    Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004); Fed. R. Civ. P. 56(c).  The facts are viewed in a light most favorable to the non-moving party and all reasonable inferences are drawn in favor of the non-moving party. *Markel v. Bd. of Regents of Univ. of Wisconsin System*, 276 F.3d 906, 910 (7th Cir. 2002).  "In the employment discrimination context, summary judgment is warranted where 'the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer has discriminated against the plaintiff.'" *Id.* (quoting *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570) (7th Cir. 1989)).

    **B.    Local 157 did not harass or discriminate against Mitchell on the basis of his race.**

    Mitchell claims that the Union has violated 42 U.S.C. § 1981 by harassing and/or discriminating against him on the basis of his race.  The methods of proof and elements of a Section 1981 claim are "essentially identical" with those for Title VII of the Civil Rights Act of 1964. *McGowan v. Deere & Co.*, 581 F.3d 575, 579 (7th Cir. 2009).  A plaintiff in an employment discrimination action may prove discrimination either through

direct evidence or indirect evidence, under the *McDonnell Douglas* burden shifting
approach. *Markel,* 276 F.3d at 910.

Mitchell does not appear to claim that there is any direct evidence that Local 157
singled him out for poor treatment on the basis of his race. *See id.* (direct evidence is that
which, if believed by the trier of fact, will prove the particular fact without reliance on
inference or presumption). Rather, Mitchell's theory is based upon his contention that the
Union did not assist him after he was subjected to acts of racial harassment and
discrimination at his workplace, and that the Union's alleged *inaction* should make it
liable for everything occurring at the job site. Specifically, Mitchell appears to claim that
(1) the Union had an affirmative duty to file grievances with his employers – including a
duty to seek the discharge or punishment of Local 157 members who engaged in the acts
of racial harassment; and, (2) the Union or its officers had an affirmative duty to file
internal Union charges against Local 157 members who had engaged in acts of racial
harassment – seeking their punishment or expulsion from the Union.

Mitchell's Section 1981 claim fails on many levels. First, as a matter of law, Local
157 had no duty under Section 1981 to take affirmative steps to remedy the acts of racial
discrimination or harassment that were occurring at the job site, under the control of
Mitchell's employers. Second, even if the Union had such a duty, the undisputed
evidence simply does not support Mitchell's claims that Local 157 did nothing. Local
157's agents were actively involved in trying to assist Mitchell. Indeed, it is significant

15

that Mitchell did not suffer a single act of racial harassment after Local 157's agents were notified of the jobsite problems and intervened on his behalf.  Third, Mitchell's complaints about the Union's alleged inaction are all after-the-fact.  Mitchell could have asked the Union to file a grievance with his employers, but he did not.  Mitchell could have filed an internal Union charge against his fellow Local 157 members, seeking their discipline, but he did not.  Mitchell cannot complain that the Union's inaction was an act of race-based discrimination when Mitchell himself took no such action, nor did he ask that the Union take such action on his behalf.

1.    Under controlling precedent, a labor union is not required to take affirmative action to remedy harassment or discrimination occurring at the workplace.

Mitchell's entire theory – that the Union was required to intervene on his behalf in an effort to remedy the acts of racial harassment occurring at the Sycamore and Babcock worksites – is contrary to the Seventh Circuit's decision in *Equal Employment Opportunity Commission v. Pipefitters Assoc., Local Union 597*, 334 F.3d 656 (7th Cir. 2003).  In *Pipefitters Local 597*, the EEOC had argued that a labor union that is aware of racial harassment occurring at the workplace, but does nothing to correct it, is just as responsible for it as the employer.  *Id.* at 658-59.  The Court rejected this argument.  It observed that the employer has the authority to prevent or eliminate such harassment, but the union does not.  *Id.* at 659.  A union is limited to filing a grievance, which of itself cannot solve or prevent the harassment.  Only the employer has that authority.  *Id.*  A

16

union cannot be held liable for merely failing to "effectuate changes in the workplace."

*Id.*

The Court also rejected any notion that a union must do what it can to prevent

racial harassment or discrimination, even though it is not guaranteed of success, noting

that "inaction, unless invidious, is not discrimination in any accepted sense of the term."

*Id.* at 660.  The Court further observed:

> Suppose that a union is lackluster, and that it will file a grievance if pressed
> to do so by a member of the collective bargaining unit, it will do nothing on
> its own initiative.  We do not understand how such passivity, though it
> means the union will not take measures to prevent racial harassment on its
> own initiative, could be thought a form of racial discrimination[.]

*Id.*  The Court also noted the difficult position occupied by a union where it represents

both the employee who is being harassed and the employee who is doing the harassing,

given the union's statutory duty to represent both fairly in their dealings with their

employer.  *Id.* at 660-61.  Placing a duty on a union to encourage an employer to

discharge or discipline any employee –  particularly one who denies having engaged in

harassing conduct – would be untenable given that the union will subsequently be obliged

to represent the employee should he choose to file a grievance over his own discharge.

Thus, the Court held that a union has no "affirmative duty to investigate and rectify

discrimination by the employer," or to prevent such discrimination or harassment.  *Id.*

The Seventh Circuit's holding is consistent with that of other courts who have

considered the question.  *See*, *e.g.*, *Anjelino v. New York Times Co.*, 200 F.3d 73, 95-96

(3rd Cir. 1999) (union not liable for race and sex-based discrimination and harassment where union neither instigated nor actively supported it, even though some of its members were participants, because employer was responsible for ensuring no harassment); *Martin v. Local 1513 of the International Assn. of Machinists*, 859 F.2d 581, 584 (8th Cir. 1988) (union not liable for acquiescing in employer's sex discrimination and failing to bargain over issue); *Catley v. Graphic Communications Int'l Union, Local 277-M*, 982 F.Supp. 1332, 1344 (E.D. Wis. 1997) (rejecting claim that union should have filed grievance in response to member's general request for help, noting that neither the Supreme Court nor the Seventh Circuit have endorsed the view that acquiescence in racial or sexual discrimination by a union creates liability).

Local 157 went far beyond what was required of it in an effort to assist Mitchell with the problems that were occurring at the job site. Local 157 did not control the worksites at the Pfizer or Cayuga Generating Station jobs. Sycamore and Babcock, respectively, controlled those sites as Mitchell's employer, and as the employer of the other Local 157 members who Mitchell alleged engaged in acts of racial harassment. Sycamore and Babcock were responsible for addressing employee behavior and ensuring that those worksites were free of racial harassment or discrimination. As a matter of law, Local 157 is not responsible for the conduct that occurred on these worksites.

2.   The undisputed evidence establishes that the Union in fact assisted Mitchell, and believed that his race-based claims had been remedied.

Mitchell's theory – that the Union acquiesced in the racial harassment against him

18

– further crumbles in the face of the uncontradicted evidence establishing that Mitchell's complaints resulted in a quick, complete remedy of his issues, and that the racial harassment in fact stopped. Local 157 business manager Michael Pleasant and business agent Donald Ritter were active participants in assisting Mitchell. In short, Local 157 helped resolve Mitchell's concerns.

The first instance of alleged racial harassment at Sycamore – involving the noose and Lindsay's comments to Mitchell about it – occurred in October or November of 2006. Mitchell waited until December of 2006 to report it to anyone. It is undisputed that as soon as Sycamore management learned about it, Sycamore initiated an investigation, including meeting with Mitchell and the other employees involved. The additional racial comments allegedly made by Burt (use of the racial epithet, "nigger") and other unnamed employees, also occurred before the Union was notified of the misconduct.

Furthermore, Mitchell called Pleasant, and Pleasant personally visited the worksite within a day or two to assist in resolving Mitchell's concerns. Sycamore told all employees involved that this sort of behavior would not be tolerated and reaffirmed its non-discrimination and harassment policies. Although Mike Burt denied having engaged in the racial harassment, Pleasant warned Burt that the Union would support disciplinary action against any employees found to have engaged in such conduct. It is particularly significant that not a single incident of racial harassment occurred while Mitchell was employed by Sycamore (a period of 4 months) *after* the Union was called and Pleasant

visited the job site.  The fact is that whatever occurred was resolved on a going-forward basis through a combination of Sycamore's timely action and Local 157's advocacy on Mitchell's behalf.

Sycamore also offered Mitchell the opportunity to transfer to a different job site in a further effort to accommodate his concerns.  Mitchell initially declined the offer, but several days later he accepted it and was moved to another work site.  It is undisputed that Mitchell was not obligated to accept that transfer and could have stayed at the Pfizer job site as long as he wished.  Furthermore, Mitchell never expressed dissatisfaction with this transfer to Pleasant, and Pleasant thus reasonably believed that Mitchell's concerns regarding the incidents at the Pfizer plant had been resolved as a result of his transfer.

Mitchell claimed in his deposition that he asked Pleasant and Sycamore's manager, J.D. Smothers, that Burt and Lindsay be transferred from the Pfizer job.  Even if this were true, Local 157 lacked any authority to effectuate a transfer of Mitchell, Burt or Lindsay from the Pfizer job site.  Only Sycamore as the employer had that authority.  Local 157 could suggest a transfer, but only Sycamore had the authority to actually transfer employees.  (Pleasant Dep. 76).  The Union's only remedy would have been to file a grievance protesting any transfer, and since Mitchell voluntarily accepted the transfer and did not ask the Union to file a grievance, the Union considered the matter resolved. Mitchell's attempt to characterize his transfer as within the Union's authority is contrary to the evidence.

20

Similarly, the Union attempted to assist Mitchell in connection with the events at the Babcock job, even though Mitchell did not initially request the Union's assistance. After Mitchell reported his co-worker's repeated use of the term "nigger" to Babcock management, Babcock began an immediate investigation, advised employees of its anti-harassment policy, and took action to separate Mitchell from Grunner, the employee who had made the inappropriate comments.  The Union was made aware of the incident by its Union steward, Lindley, and business agent Don Ritter came to the jobsite and spoke with Grunner and Mitchell.  After Mitchell was informed that he would be separated from Grunner, Ritter asked him if he was satisfied with this resolution, and Mitchell indicated he was.

Like at the Sycamore job, it is worth noting that no act of racial harassment occurred after the Union's agent, Don Ritter, visited the jobsite and spoke with employees.  All such acts, including the incident in which Mitchell's lunch was urinated on, occurred before Ritter's visit.

Mitchell was terminated by Babcock on July 12.  Of course, this was not an act of Local 157, but rather Babcock's decision.  Mitchell called Pleasant that day to notify him of his termination, and Local 157 immediately referred him to a new employer.  Mitchell did not ask the Union to file a grievance protesting his discharge from Babcock; he asked to be referred to a new job, and Local 157 complied.

21

In sum, almost the entirety of Mitchell's complaint against the Union hinges on the idea that Local 157 failed to take any action to both assist him and stop further acts of racial harassment. Nothing could be further from the truth, as revealed by the undisputed evidence.

> 3.      Mitchell never asked the Union to file a grievance or charge on his behalf.

Although Mitchell now complains that the Union should have filed a grievance or internal union charge for him, *on its own initiative*, Mitchell concedes that he never asked any Union official to take such action. The Union never refused to file a grievance or charge for Mitchell; the fact is that Mitchell never asked that one be filed. It is difficult to conceive how the Union can be subjected to liability for failing to do something that not even Mitchell asked to be done. In fact, courts have consistently rejected complaints against a union for failing to file a grievance where no such action was requested. *See, e.g.*, *Thorn v. Amalgamated Transit Union*, 305 F.3d 823, 833 (8th Cir. 2002) (union's passive acquiescence to employer's sexual harassment not actionable where no request to file a grievance); *Catley v. Graphic Communications Int'l Union, Local 277-M*, 982 F.Supp. 1332, 1343 (E.D. Wis. 1997) (employee must ask the union to initiate the grievance process); *Badlam v. Reynolds Metal Co.*, 46 F.Supp.2d 187, 201 (N.D.N.Y. 1999) (no rational jury find a violation where the member did not request that a grievance be filed); *see also*, *Mechmet v. Four Seasons Hotel, Ltd.*, 825 F.2d 1173, 1178 (7th Cir. 1987) ("if a worker doesn't even ask his union to press a grievance for him he can hardly

complain that it has failed to represent him").

Mitchell further claims that Local 157 had some affirmative obligation to file internal charges against his fellow members who he alleged had engaged in acts of racial harassment against him. There is no authority for the idea that Local 157, as an entity, had an obligation to proffer internal union charges against one member in order to satisfy the concerns of another member, or that the failure to file such a charge could violate Section 1981. Indeed, Mitchell's argument makes little sense when closely examined.

Such a charge would be filed pursuant to the bylaws of Local 157, seeking a form of sanction against the offending member, which could include a fine, admonishment or expulsion from membership. Section 27 of the bylaws provides that such a charge can be filed by any member or officer of the Union. Mitchell was a member at all relevant times and was perfectly capable of filing such charges. Local 157 cannot be held liable for failing to do something that Mitchell himself could have done, but chose not to do.

In essence, Mitchell seems to be arguing that the officers of Local 157 had an obligation to initiate an internal charge merely because they received a report (of which they had no personal knowledge) indicating a potential violation of the bylaws. The bylaws do not require this, and as a matter of fact, that is not the practice. As Pleasant testified, the officers of the local do not file such charges on behalf of one member against another where they lack personal knowledge of the facts, but rather the individual member initiates a charge by filing it in writing. Again, Mitchell himself could have done

this, at which time his charge would have proceeded through the process set forth in the Local 157 bylaws, consistent with the UA constitution.

Mitchell certainly has no evidence that would reveal any racial motivation in the decision by Local 157 officers not to file a charge. It is undisputed that Mitchell never asked that this be done. Neither Pleasant nor Ritter had any direct or personal knowledge of what had occurred on the Sycamore or Babcock jobsites for them to have filed such charges. And, the only two charges that were ever filed during Pleasant's tenure were the result of a member choosing to file a written charge. There is simply no evidence, either direct or indirect, that Local 157 or its officers decided not to file a charge against a member on the basis of racial animus.

An additional point worth noting is that Mitchell's view that Burt, Lindsay, or Grunner (the Local 157 members who he alleges engaged in racially hostile acts) should have been expelled from membership of Local 157 would not serve any purpose, to the extent that the goal is to keep Mitchell from having to ever work with them again as opposed to simply punishing them. Local 157 operates an exclusive hiring hall, and it is not permitted to discriminate in the referral of employees to potential employers on the basis of their membership or non-membership in Local 157. *Stagehands Referral Service, LLC*, 347 NLRB 1167, 1170 (2006); *Bricklayers Local 7 (Masonry Builders)*, 224 NLRB 206 (1976), enfd. 563 F.2d 977 (9th Cir. 1977). Thus, even if Burt, Lindsay and/or Grunner were expelled from membership, Local 157 would nonetheless be

obligated to refer them to work upon their request.

    4. <u>Mitchell cannot otherwise establish a *prima facie* case of racial discrimination against Local 157.</u>

   There is no evidence that the Union treated Mitchell differently than it treated any other similarly-situated Union member, or that it selectively chose not to assist Mitchell because he is African-American, as compared to other members. *See*, *Pipefitters Local Union 597*, 334 F.3d at 661. The evidence is to the contrary. Grievances are very rarely filed by Local 157 or its members, with only four to five having been filed in the 4 ½ year tenure of Pleasant as business manager. And further, they are filed only when the affected member requests that they be filed. There is not a single example of the Union having filed a grievance on behalf of any member who did not request that one be filed, whether that member is caucasian or African-American. Accordingly, Mitchell's claim under Section 1981 fails for the additional reason that he cannot establish a most-basic element of the *prima facie* case – the existence of similarly-situated individuals who received more favorable treatment from the Union.

**C. Mitchell's state law claim that Local 157 violated the bylaws as a result of its alleged failure to remedy his racial harassment fails as a matter of law.**

    1. <u>Mitchell failed to exhaust his remedies under the bylaws.</u>

   Mitchell's claim that Local 157 breached its bylaws also lacks either evidentiary or legal support, and judgment should either be granted in favor of Local 157 or the claim dismissed. Mitchell's state law claim is subject to Ind. Code § 22-7-2-1, which generally

provides that a labor organization's bylaws are enforceable contracts between a member and his union. *Communication Workers of America, Local 5701 v. Drake*, 487 N.E.2d 821, 824 (Ind. Ct. App. 1985). This statute, however, provides an important limitation on the enforcement of such bylaws. It states, in pertinent part: "Provided, However, that such member or members <u>shall exhaust</u> all rights, privileges and remedies provided by the constitution, by-laws, or other laws of said labor organization, before bringing any such action at law or in equity." (emphasis added). This statutory provision is clear and mandatory. *See*, *e.g.*, *Randolph v. Leeman*, 146 N.E.2d 267 (Ind. Ct. App.1957).

Mitchell plainly did not exhaust available remedies. Sections 27 and 28 of Local 157's bylaws provide a procedure for a member to file an internal charge alleging violations of the bylaws. Mitchell admits that he did not file such a charge. Therefore, his claim that Local 157 violated its bylaws in connection with the events that occurred on the Sycamore and Babcock jobsites, or that any of the Union's officers mishandled his complaints, is statutorily barred.

2.    <u>Because the Union did not discriminate against Mitchell on the basis of his race, the very same conduct does not violate the bylaws.</u>

Even if Mitchell's claims under the bylaws were not barred by his failure to exhaust, they also fail because they lack merit. It is unclear precisely what portion of the bylaws Mitchell believes the Union violated. But it appears that Mitchell is merely parroting his Section 1981 claim, arguing that the same *inaction* by the Union is a breach of the bylaws, that Local 157 has some general contractual duty not to discriminate

26

against him on the basis of his race.  For the same reasons as set forth above, Local 157

has not discriminated against Mitchell on the basis of his race, and as such, his state law

claim fails as a matter of law.

### D.     Alternatively, Mitchell's state law claim should be dismissed.

Generally, when federal claims fall out before trial, the court should dismiss

without prejudice any supplemental state law claims.  *Mechmet v. Four Seasons Hotel,*

*Ltd.*, 825 F.2d at 1178 (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966)).

Exceptions to this rule have developed, including where the state law claim is patently

frivolous and dismissal would only burden state law courts.  *Van Harken v. City of*

*Chicago*, 103 F.3d 1346, 1354 (7th Cir. 1997); *Mechmet*, 825 F.3d at 1178.  Here,

Mitchell's state law claim is frivolous in that he plainly failed to exhaust the remedies in

the bylaws, and this claim appears only to mirror his federal claims on a state law contract

basis.  But to the extent this Court is inclined to believe that the claim is something other

than frivolous, it should be dismissed and Mitchell can choose whether to pursue it in

state court.

## IV.     CONCLUSION

For the foregoing reasons, Defendant Plumbers and Steamfitters Local Union No.

157 respectfully requests that its Motion for Summary Judgment as to all counts of the

Plaintiff's First Amended Complaint be granted as there are no genuine issues of material

fact and Local 157 is entitled to judgment as a matter of law.

Respectfully submitted,


/s/ William R. Groth
William R. Groth


FILLENWARTH DENNERLINE GROTH & TOWE, LLP
429 E. Vermont Street, Suite 200
Indianapolis, IN 46202
Telephone:  (317) 353-9363
Fax:  (317) 351-7232
E-mail: wgroth@fdgtlaborlaw.com


## CERTIFICATE OF SERVICE

I hereby certify that on the 16th day of November, 2009, a copy of the foregoing pleading was filed electronically.  Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Robert P. Kondras, Esq.          E-mail: kondras@huntlawfirm.net
Hunt Hassler & Lorenz, LLP

Craig Morris McKee, Esq.         E-mail: cmmckee@wilkinsonlaw.com
Wilkinson Goeller Modesitt
        Wilkinson & Drummy


/s/ William R. Groth
William R. Groth


28