UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| BARON D. MITCHELL,<br>    *Plaintiff*, | )<br>)<br>) |
| *vs*. | )   2:08-cv-00230-JMS-WGH<br>) |
| PLUMBERS AND STEAMFITTERS LOCAL UNION<br>NO. 157 and SYCAMORE ENGINEERING, INC.,<br>    *Defendants*. | )<br>)<br>)<br>) |

**ENTRY ON PLUMBERS AND STEAMFITTERS
LOCAL UNION NO. 157'S MOTION FOR SUMMARY JUDGMENT**

Presently before the Court is Defendant Plumbers and Steamfitters Local Union No. 157's (the "Union") Motion for Summary Judgment. [Dkt. 54.]

A motion for summary judgment asks that the Court find that a trial based on the uncontroverted and admissible evidence would—as a matter of law—conclude in the moving party's favor and is thus unnecessary. *See* Fed. R. Civ. Pro. 56(c), (e). When evaluating a motion for summary judgment, the Court must give the non-moving party the benefit of all reasonable inferences from the evidence submitted and resolve "any doubt as to the existence of a genuine issue for trial...against the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). Thus the key inquiry concerns the existence of evidence to support a plaintiff's claims, not the weight or credibility of that evidence—both of which are assessments reserved to the trier of fact. *See Schacht v. Wis. Dep't of Corrections*, 175 F.3d 497, 504 (7th Cir. 1999) ("Roughly speaking, [summary judgment] is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events.").

**BACKGROUND**

Mr. Mitchell, an African-American member of the Union, claims that he was subjected to a racially hostile environment while working for two employers: Sycamore Engineering, Inc.

- 1 -

("Sycamore"), which remains a party to this action; and Babcock & Wilcox ("Babcock"), which was previously dismissed from this action by agreement, [*see* dkt. 17].

### A. Sycamore

By separate contemporaneous order, the Court has denied Sycamore's motion for summary judgment; numerous issues of fact exist about the nature and extent of the racially hostile workplace that Mr. Mitchell claims to have endured while working for Sycamore at its "Pfizer" jobsite. Briefly, Mr. Mitchell presented evidence that his supervisor, Mr. Lindsey, had been using racial epithets and that he had observed two nooses, one tied by Union Steward Mr. Burt.[1] After he complained about the hostile work environment to Sycamore management, Mr. Mitchell's co-workers began "running around dancing and saying, 'ooga booga,'" when he was around. [Dkt. 82-1 at 8.] He also presented evidence that Mr. Burt subsequently called him a "nigger" to his face. [*Id.*] Finding the conditions at Sycamore Pfizer intolerable, Mr. Mitchell first rejected but then accepted Sycamore's offer to transfer to its "hospital" worksite, a less desirable location because of the reduced possibility of overtime. The Court has found that a material issue of fact existed as to whether that transfer was voluntary.

As is particularly relevant to this motion, which concerns the extent of the Union's liability, Mr. Mitchell testified that he called Mr. Pleasant—the highest ranking official in the Union—after Mr. Burt's racial slur. [*Id.* at 9.] Mr. Pleasant came out to the jobsite. Conflicting evidence exists as to the extent, if any, to which Mr. Pleasant actually investigated the racial harassment at Sycamore Pfizer. Mr. Mitchell testified that he told Mr. Pleasant that he wanted Mr. Lindsey and Mr. Burt transferred away from the Sycamore Pfizer site, [*id.* at 15], relief that the

---

[1] As steward at the jobsite, Mr. Burt was the Union official tasked with the duty "to properly police and protect the work jurisdiction of the … Union and adjust, if possible, any grievance or complaint arising out of any violation of the [collective bargaining] Agreement and/or By-Laws of the Local Union." [Dkt. 46-7 at 16.] The position is uncompensated. [Dkt. 68-4 ¶10.]

Union argues, and Mr. Mitchell doesn't dispute, was within the exclusive province of Sycamore to provide.  Mr. Pleasant never asked Sycamore to transfer Mr. Lindsey or Mr. Burt, nor did he ask Sycamore to fire them.  [Dkt. 59-2 at 12.]  Mr. Pleasant did, however, tell Mr. Burt that racial remarks wouldn't be tolerated and that the Union would support Sycamore if Sycamore disciplined any employee guilty of inappropriate words or conduct.  [Dkt. 56-5 at 3.]  Such conduct would violate the collective bargaining agreement.  [Dkt. 56-8 at 11.]  Mr. Mitchell voiced satisfaction with Mr. Pleasant's response at the time vis-à-vis Sycamore, and he didn't (until this lawsuit) complain to the Union that he wanted further action with respect to his harassers including, for example, the filing of a grievance with Sycamore.  [Dkts. 56-2 at 16; 56-5 at 3.]

### B. Babcock

The collective bargaining agreement with Babcock, where Mr. Mitchell later worked, likewise prohibited racial harassment.  [Dkt. 56-9 at 6.]  But as with Sycamore, Mr. Mitchell has presented evidence that he was subjected to a racially hostile work environment.

A fellow Union member, Mr. Gruner, repeatedly used "nigger" in Mr. Mitchell's presence.  [Dkt. 82-1 at 21.]  Mr. Mitchell testified that Union Steward Lindley attempted to convince Mr. Mitchell to accept Mr. Gruner's apology rather than proceeding to complain directly to Babcock management.  [Dkt. 56-1 at 40-41.]  Mr. Mitchell refused to drop his complaint.  [*Id.*]  The next day, Babcock management told Mr. Mitchell that it would hold a meeting with its employees to review its anti-harassment policies and that Mr. Gruner was terminated and would not be rehired.  [Dkts. 56-1 at 51; 82-1 at 29.]  The harassment continued:  Someone put urine in Mr. Mitchell's lunchbox and scribbled "nigger" on the lunch table.  [Dkt. 56-1 at 46.]  To separate himself from the situation, Mr. Mitchell was given three days of paid leave.  [Dkt. 82-1 at 39.]

When Mr. Mitchell returned to work, he learned that Babcock no longer intended to fire Mr. Gruner, but had simply suspended him for three days. [Dkt. 82-1 at 39.] No explanation for the change of heart was evidently provided then (or now). Union Business Agent Ritter had, however, met with Babcock management in the interim, though he denies that he attempted to intervene on behalf of Mr. Gruner (who had filed no written grievance request). [Dkt. 68-4 ¶5.] Mr. Mitchell asked a Babcock manager to smell his lunchbox again. [Dkt. 56-1 at 52.] When the manager refused, Mr. Mitchell went to the parking lot to telephone Duke Energy, which owned the construction site, to complain about Babcock. [*Id.* at 53.] Mr. Mitchell was then fired for using the telephone during work hours. [*Id.*] Mr. Lindley, the Union steward, delivered the news of Mr. Mitchell's termination to him. [*Id.*] And, according to Mr. Mitchell, Mr. Lindley did so "with a smile on his face." [*Id.*]

Mr. Mitchell later met with Mr. Pleasant to complain about the Union's lack of action in response to his race complaints, which he felt was discriminatory. [Dkt. 82-1 at 33-34.] According to Mr. Mitchell's version of events, Mr. Pleasant was unsympathetic and "said basically I had not a leg to stand on. If I wanted to file a grievance with the EEOC or get a lawyer then go ahead and do it. Because the Union had a lawyer, and I didn't have a leg to stand on." [*Id.* at 36.]

### C.  Union Procedures for Member Complaints

Union members who believe that they have been discriminated against (or otherwise unfairly treated) have two procedural mechanisms for obtaining redress of those complaints.

If members believe that their employer is responsible for the violation, members can ask the Union to file a grievance on their behalf. [*See* dkt. 56-7 at 16.] The collective bargaining agreements here permit only Union representatives to process and adjust grievances. [*See* dkts.

56-8 at 10; 56-9 at 8.] The relevant Union representative is either the Union steward on the jobsite or, if the steward is unavailable or unwilling, the Union's Business Manager (i.e. Mr. Pleasant). [*Id.*] A dispute exists about whether a written request is required to activate the grievance procedure. Mr. Mitchell has introduced, for example, evidence that the Union lacks any prepared grievance forms. [Dkt. 59-7 at 4.] In any event, the parties agree that Mr. Mitchell never filed a written grievance request.

If members wish to complain about the treatment that they have received from their fellow Union members, members can initiate an intra-Union complaint themselves that, if sustained, may result in various punishments, including fines or expulsion. [Dkt. 56-7 at 11-12.]

## DISCUSSION

Mr. Mitchell claims that the Union is liable to him for discrimination under 42 U.S.C. § 1981 and for breach of contract under Indiana law.

### A. Claims Under 42 U.S.C. § 1981

By statute, Congress has proscribed racial discrimination in the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Inasmuch as "[t]he constitution of a local union…is a contract between the union and its members," *Korzen v. Local Union 705*, 75 F.3d 285, 288 (7th Cir. 1996) (citations omitted), and inasmuch as unions represent their members in employment contracts, unions may not engage in racial discrimination against their members, *see, e.g.*, *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 669 (1987) (holding that union violated § 1981 by refusing to file grievances for racial discrimination by black members). As the parties agree, [dkts. 55 at 14; 59 at 18], the standards for proving a § 1981 violation are essentially the same as for proving a Title VII violation. *EEOC v. Pipefitters Ass'n. Local Union 597*, 334 F.3d 656, 658 (7th Cir. 2003) (collecting cases).

Here, Mr. Mitchell charges that the Union violated § 1981 in three ways: (1) by refusing to help him grieve racial discrimination occurring at his job site; (2) by favoring his white harassers regarding his claims of racial discrimination; and (3) by creating a racially hostile work environment through the Union's representatives acting in that capacity.

### 1. The Union's Failure to Grieve Mr. Mitchell's Racial Harassment Claims

Unions must grieve their members' claims of racial discrimination claims when asked to do so. *Id.* at 659 ("[A] union that refuses to accept blacks as members, or refuses to press their grievances, is guilty of discrimination."). The Seventh Circuit has, however, rejected the notion that unions must proactively complain about an employer's racially hostile work environment absent a grievance request. *See id.* at 660 ("Suppose that a union is lackluster, and while it will file a grievance if pressed to do so by a member…, it will do nothing on its own initiative. We do not understand how such passivity…could be thought a form of racial discrimination…."); *Mechmet v. Four Seasons Hotel, Ltd.*, 825 F.2d 1173, 1178 (7th Cir. 1987) ("[I]f a worker doesn't even ask his union to press a grievance for him he can hardly complain that it has failed to represent him.").

A union's failure to process a grievance requested by a member violates § 1981 upon proof of three elements: (1) The employer violated the collective bargaining agreement with respect to the member's treatment; (2) the union "breached its own duty of fair representation by letting the breach go unrepaired;" and (3) "some evidence" exists that the union's decision not to pursue the grievance was motivated by discriminatory animus. *Greenslade v. Chicago Sun-Times*, 112 F.3d 853, 866 (7th Cir. 1997) ("To establish a Title VII claim against the Guild, Greenslade must show: (1) the Sun-Times violated the collective bargaining agreement between the union and the newspaper; (2) the Guild breached its own duty of fair representation by letting

the breach go unrepaired; and (3) that some evidence indicates animus against males motivated the Guild." (collecting cases)); *see also Gen. Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 391 (1982) (holding that § 1981 claims require proof of "purposeful discrimination").

Mr. Mitchell has sued the Union under § 1981, in part, because Mr. Pleasant failed to grieve Sycamore and Babcock's continued employment of his alleged harassers and their ultimate termination of him. [Dkt. 59 at 13.][2] He concedes that he never explicitly asked Mr. Pleasant (the Union official he contends was ultimately obligated to initiate the grievance on his behalf) to file a grievance. [*Id.* at 22 (conceding that he never explicitly "us[ed] some magic term like 'file my grievance.'").] He contends that he didn't use those words because he "had no knowledge or understanding of the grievance process" available under the collective bargaining agreements. [*Id.* at 21.] Nonetheless, the law charges Mr. Mitchell with knowledge of its existence. *See Bell v. DaimlerChyrsler Corp.*, 547 F.3d 796, 807 (7th Cir. 2008) ("[T]he general rule is that ignorance of one's internal union remedies does not excuse the failure to pursue such remedies before bringing suit." (citations omitted)). And it is especially appropriate to do so here because Mr. Mitchell actually possessed copies of the collective bargaining agreements, which he only needed to read. [Dkts. 56-1 at 55; 68-1 at 3]. As the cases that Mr. Mitchell has collected indicate—cases which the Union hasn't attempted to distinguish—the law will, however, excuse strict compliance with the formalities of the grievance-request procedure if the union member demonstrates at least "reasonable" compliance with it. *E.g.*, *Jimerson v. Int'l Longshoreman's Ass'n*, 2005 WL 3533044, *7 n.2 (S.D. Ga. 2005) (citing *Breda v. Wolf Camera &*

---

[2] Mr. Mitchell stakes his failure-to-grieve claim on the actions of Mr. Pleasant. [*See* dkt. 59 at 21 ("[O]n both occasions when he was subjected to severe racial harassment, working for Sycamore Engineering and later Babcock & Wilcox, Mitchell made direct contact with Local 157 Business Manager Mike Pleasant to ask him for the union's help in combating the discrimination.").]

*Video*, 222 F.3d 886 (11th Cir. 2000)); *accord Ekeledo v. Sealy Mattress Co.*, 1989 WL 97811, *4 (N.D. Ill. 1989).

With those legal principles in mind, the Court will first address Mr. Pleasant's failure to institute a grievance with Sycamore before addressing his failure to institute one with Babcock.

### a. The Failure to Grieve with Sycamore

Even assuming (as the Court must, given the conflicting evidence) that Mr. Mitchell could legitimately make an oral grievance request to Mr. Pleasant instead of a written one, the evidence still fails to establish that Mr. Pleasant either knew or reasonably should have known that Mr. Mitchell actually wanted Mr. Pleasant to take the relatively infrequent step of filing a grievance, [*see* dkt. 56-2 at 25 ("Q: About how many grievances do you [Mr. Pleasant] recall coming to your attention while you were business manager [for four-and-a-half years]? A: I'm going to say, guessing four or five.")].

Previously, Mr. Mitchell had accepted informal resolution of claims of racial harassment. While working at Craft Mechanical as an apprentice, Mr. Mitchell contacted the Union about racial harassment at the hands of one of his fellow apprentices. [Dkt. 56-1 at 7.] The Union official overseeing the apprenticeship school "called the apprentice in and had a talk with him about what was being said [and said that] he wasn't supposed to say anything like that again." [*Id.*] That conversation stopped the inappropriate conduct, without resort to a grievance with Craft Mechanical. [*Id*. at 7-8.] Mr. Mitchell nonetheless decided to stop working at Craft Mechanical. [*See id.* at 8.]

Mr. Pleasant similarly employed informal action to attempt to address Mr. Mitchell's racial harassment concerns at the Sycamore Pfizer site. Mr. Mitchell asked Mr. Pleasant "to come out there so we could get this [racial harassment] resolved." [*Id.* at 17]. Mr. Pleasant came to

the job site as requested, within forty-eight hours. [*Id.* at 23.] Mr. Pleasant met with Mr. Burt and "explained to [him] that racial remarks would not be tolerated and that Local 157 would support Sycamore taking disciplinary action against any of its employees found to be engaged in inappropriate words or conduct." [Dkt. 56-5 at 3.] At the end of the meeting at the Sycamore Pfizer site, Mr. Pleasant has testified—and Mr. Mitchell hasn't denied—that Mr. Mitchell "said he thought [the racial harassment he had been experiencing] was taken care of." [Dkt. 56-2 at 16.]

Even after Mr. Mitchell was, at least for the purposes of summary judgment, involuntarily transferred to the less desirable Sycamore hospital worksite, Mr. Mitchell makes no claim that he ever attempted to convey to Mr. Pleasant that he expected anything more of the Union. He never asked Mr. Pleasant to return him to his job at Sycamore Pfizer.

Given Mr. Mitchell's previous satisfaction with informal resolution of his complaints, his ambiguously worded request for help, his professed satisfaction with Mr. Pleasant's actions, and Mr. Mitchell's failure to follow up, the Court finds that Mr. Mitchell has failed to establish that Mr. Pleasant either knew or reasonably should have known that Mr. Mitchell wanted the Union to initiate a formal grievance with Sycamore regarding Mr. Mitchell's treatment at the Sycamore Pfizer location. Accordingly, Mr. Mitchell cannot prevail on his claim that the Union wrongfully refused to grieve his treatment with Sycamore.

### b. The Failure to Grieve with Babcock

In contrast to the situation with Sycamore, Mr. Mitchell has presented evidence that he sought Mr. Pleasant's help after his termination. That evidence, if believed, establishes that he was unhappy with the Union's response to his situation—a response that never included a formal grievance or informal Union complaint over Babcock's decision to terminate him instead of his

harassers. Indeed, Mr. Mitchell specifically recalls saying, "Why do I pay dues but I'm not treated like a Union member. Why can't I get help. When I have racial problems, I can't get any help…." [Dkt. 82-1 at 33-34.] A jury may conclude that Mr. Pleasant knew or reasonably should have known that Mr. Mitchell wanted the Union to take action against Babcock whether or not, as the Union maintains, Mr. Mitchell had originally only requested assistance locating new employment the day that he was fired, [*see* dkt. 67 at 7].

Mr. Mitchell has also presented "some evidence" that racial animus motivated the Union's decision to let the harassment—which the Union doesn't dispute violated the collective bargaining agreement—continue without a grievance. *Greenslade*, 112 F.3d at 866.

First, the Union takes inconsistent positions. *Cf. Appelbaum v. Milwaukee Metro*, 340 F.3d 573, 579 (7th Cir. 2003) (collecting cases holding that "shifting or inconsistent explanations" can establish a prima facie case of discrimination). One the one hand, it claims to not have known that Mr. Mitchell was unhappy with the Union's lack of response. Yet it also maintains that Mr. Pleasant told Mr. Mitchell (which Mr. Mitchell denies) about the possibility of filing a grievance over harassment.

Second, Mr. Mitchell has successfully identified Mr. Gruner as a comparator who, at least for the purposes of summary judgment, received preferential treatment. *See Yong-Qian Sun v. Bd. of Trs.*, 473 F.3d 799, 814 (7th Cir. 2007) (collecting cases holding that identifying a similarly situated, but better treated, comparator establishes a prima facie case of discrimination). Before Mr. Ritter met with Babcock's management—a meeting undertaken without a written grievance request by Mr. Gruner—management had announced that they were terminating Mr. Gruner and making him ineligible for rehire. [Dkt. 82-1 at 29.] After Mr. Ritter's meeting with management, [dkt. 59-8 at 12], Babcock reduced Mr. Gruner's punishment to a mere three-day

suspension, [dkt. 82-1 at 39]. While Mr. Ritter denies that he intervened on Mr. Gruner's behalf, [dkt. 68-4 ¶5], the Court finds that the timing of the change in discipline, together with the Union's inability to proffer any explanation for Babcock's significant change of heart, are simply too "suspicious" to prevent an inference that Mr. Ritter did, in fact, intervene. *See Yong-Qian Sun*, 473 F.3d at 812 (noting that "suspicious timing" can create an inference of discrimination).

Under the familiar *McDonnell Douglas* three-part burden-shifting scheme in Title VII cases (which the parties agree applies to this § 1981 action), the Union could rebut an inference of discrimination by offering a non-discriminatory reason for its actions. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Because the Union hasn't offered such a reason, the Court won't continue with the burden-shifting analysis. Instead, the Court will simply find that genuine issues of material fact exist regarding the Union's failure to file a grievance on Mr. Mitchell's behalf with respect to Babcock.

### 2. Favoring Mr. Mitchell's Harassers

Setting aside the failure to grieve his claims of racial discrimination, Mr. Mitchell next claims that the Union violated § 1981 by affirmatively favoring his white harassers over him when responding to his complaints. In other words, he complains that the Union treated its white members better than its black members. *See* 42 U.S.C. § 1981(b) (guaranteeing equal "enjoyments of all benefits, privileges, terms, and conditions of the contractual relationship" regardless of race). Although the parties haven't explicitly set forth the elements for this theory, they implicitly agree that Mr. Mitchell's claim requires that he present evidence that the Union conferred a benefit of membership on a white member that it did not confer upon him. *See id.*; *see also* Title VII § 703(c), *codified at* 42 U.S.C. § 2000e-2(c)(1) ("It shall be an unlawful employment

practice for a labor organization…to discriminate against[] any individual because of his race, color, religion, sex, or national origin.").

In assessing Mr. Mitchell's claims, the Court must reconcile *Pipefitters*, discussed above in the context of the failure to grieve, with *Maalik v. International Union of Elevator Constructors*, 437 F.3d 650 (7th Cir. 2006). In that latter, Title VII case, the Seventh Circuit held the union liable for failing to make a reasonable response to reports of discrimination in its apprenticeship program that it administered. *Id.* at 653.

The Union would have the Court disregard *Maalik* entirely because Mr. Mitchell's present claims don't specifically arise in the context of the Union's administration of an apprenticeship program. But the Court will not do so because, unlike the Union, the Court doesn't find that the cases conflict. *Pipefitters* makes employers, not unions, primarily responsible for combating racial harassment at the workplace under the theory that employers are better situated to combat it. *See Pipefitters*, 334 F.3d at 659 ("The employer is in a better position than the union to prevent or eliminate harassment because it can discipline its employees; the union cannot. If a worker complains to a union that he is being harassed, all the union can do is file a grievance on his behalf against the employer…."). In the context of union apprenticeship programs, however, unions are capable of preventing and remedying harassment through, for example, "intra-union remedies such as fines, suspension, or expulsion." *Maalik*, 437 F.3d at 653. Thus, the two cases collectively teach that a union is liable for its actions and inactions with respect to discrimination in the activities that it controls because it possesses tools to combat discrimination in its own activities. Here, Mr. Mitchell seeks redress for differences in the privileges of Union membership; he essentially argues that his white Union brothers received more value for their dues than he

did.  Only intra-Union action can address that inequity, thus bringing this § 1981 case within *Maalik*'s ambit.

### a. Sycamore

With respect to his harassment at Sycamore, Mr. Mitchell claims that the Union didn't properly investigate and respond to his reports of racial harassment at the hands of Mr. Lindsey and Union Steward Burt.  In his view, had the Union done so, it would have found his complaints to have been substantiated and would have resulted in Union discipline, up to expulsion, for them—leaving him to face a hostile work environment while their actions went unpunished.[3]

For its part, the Union strenuously maintains that it adequately investigated Mr. Mitchell's complaints.  It contends that it simply found them to be disputed and thus not appropriate for further action absent a written disciplinary request from Mr. Mitchell.

The Union's position cannot prevail on summary judgment given that Mr. Mitchell's has proffered evidence suggesting that the Union's investigation was half-hearted at best, and completely lacking at worst.  [*See, e.g.*, dkt. 59-3 at 10 (Mr. Burt denying that anyone from the Union ever asked him about nooses at the Sycamore Pfizer site).]  And to the extent that the Union leadership believes that it was automatically excused from acting if the allegedly harassing members denied Mr. Mitchell's claims, the Court rejects that view.  The Union was obligated to take reasonable steps with respect to the information its investigation uncovered—steps that may have required it to stick up for the less popular minority member.  *See Maalik*, 437 F.3d at 653 (rejecting the union's "view that its members may do as they please, and that the local's leaders won't risk a threat to reelection by taking the side of any minority or stirring up intra-membership con-

---

[3] To the extent that he complains that the Union failed to have his harassers fired or transferred or that it failed to protest Sycamore's transfer of him to the hospital job site, those claims fail because Mr. Mitchell didn't ask the Union to file a grievance with Sycamore over his working conditions.

flict"). While Mr. Mitchell's failure to initiate a disciplinary charge himself (discussed in detail later) may militate against a finding of unreasonableness on the Union's part, it doesn't do so to such an extent as to authorize summary judgment. The jury must decide whether the reasonable course of action in the absence of a written request for discipline was to advise Mr. Mitchell to just "ignore" the nooses and the racial epithets, [dkt. 56-1 at 25], particularly where the Union's by-laws explicitly permitted Mr. Pleasant to strip Mr. Burt of his position as steward even absent a written disciplinary charge, [dkt. 56-7 at 16 ("Stewards shall be appointed or removed by the Business Manager at his discretion.")].

### b. Babcock

Mr. Mitchell contends that the Union likewise favored its white members over him with respect to his claims at Babcock by attempting to stop him from complaining about racial harassment.[4] Upon learning that Mr. Mitchell was going to report Mr. Gruner for racial harassment, Union Steward Lindley (according to Mr. Mitchell) "verbally jumped on" Mr. Mitchell for "trying to take [Mr. Gruner's] job from him" despite his being a fellow "brother[] in the Union." [Dkt. 56-1 at 40.]

The Union implicitly acknowledges the impropriety of any attempt to "pressure" Mr. Mitchell into enduring a hostile work environment. [*See* dkt. 67 at 9.] It simply contends that he "mischaracterizes" Mr. Gruner's actions as "pressure." [*Id.*]

Because Mr. Mitchell is entitled to a favorable view of the evidence on summary judgment and because Mr. Mitchell's characterization isn't unreasonable, the Court will credit it and find a genuine issue of material fact with respect to it as well.

---

[4] Mr. Mitchell also complains that the Union didn't attempt to fight for his job. That complaint, which concerns the Union's actions vis-à-vis his employer and thus subject to the requirements of *Pipefitters*, has already been addressed.

### 3. Creating a Racially Hostile Work Environment

Mr. Mitchell also claims that Mr. Burt acted within the capacity of Union steward when he called Mr. Mitchell "nigger" and that conduct is, therefore, imputed to the Union itself. *See Eliserio v. United Steelworkers of Am. Local 310*, 398 F.3d 1071, 1076-77 (8th Cir. 2005) ("A union has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination. On the other hand, a union may be held liable under Title VII if the union *itself* instigated or actively supported the discriminatory acts." (citation and quotation omitted; original emphasis)). But Mr. Mitchell has come forth with no evidence that Mr. Burt uttered that statement in connection with Union business. Furthermore, Mr. Pleasant specifically disavowed the appropriateness of that comment. Under those circumstances, the Court finds that Mr. Mitchell has failed to come forth with evidence that Mr. Burt was inciting racial tension on behalf of the Union. The Union is entitled to summary judgment on that claim.

### B. Claims for Breach of Contract

Relying upon an Indiana statute that makes union constitutions and by-laws enforceable contracts for union members, Ind. Code § 22-7-2-1, Mr. Mitchell claims that the Union breached various contractual provisions when it discriminated against him here. But, as the Union correctly points out, the Indiana General Assembly has conditioned any breach-of-contract claim upon the exhaustion of intra-union remedies before filing suit. *Id.* ("[M]embers … shall exhaust all rights, privileges and remedies provided by the constitution, by-laws, or other laws of said labor organization, before bringing any such action at law or in equity."). Mr. Mitchell admits that he never did so—nor did he even try. He offers three, ultimately unpersuasive, reasons why his breach-of-contract claim should nonetheless proceed.

First, he claims that § 27 of the By-Laws doesn't apply to his claims because his claims are against the Union as a whole, not an individual member. That section permits internal griev-

ances when one member claims to have been "discriminated against by another member or officer of the Local Union in connection with Local Union business." [Dkt. 56-7 at 11.] But because the Union—as a non-natural person—can only operate, or allegedly discriminate, by and through its individual members, the Court rejects Mr. Mitchell's argument.

Second, Mr. Mitchell contends that § 27 doesn't apply because his discrimination claims don't implicate "Local Union business." That contention fails because the Union's representation of its members—the heart of this lawsuit—unquestionably constitutes the "business" of the Union. Indeed, the Union only exists to represent its members' interests.

Finally, he claims that any intra-union remedies would have necessarily been futile. He doesn't, however, cite any Indiana authority recognizing futility as a valid excuse for failure to pursue statutorily mandated exhaustion of internal remedies. Particularly given that he has failed to come forth with any evidence of racial hostility by the Executive Board, which would have handled any claim, [*id.*], the Court declines to create any such authority here. Having "fresh eyes" look at Mr. Mitchell's treatment may well have avoided the need for litigation entirely—a particularly worthy goal in this era of ever burgeoning dockets.

The Indiana General Assembly, not this Court, makes Indiana law. The General Assembly has chosen to require union members to exhaust their intra-union remedies before suing their unions for breach of contract. Mr. Mitchell failed to do so. Accordingly, the Court must grant the Union summary judgment with respect to Mr. Mitchell's breach-of-contract claim.

## CONCLUSION

The Union's Motion for Summary Judgment, [dkt. 54], is **GRANTED IN PART** and **DENIED IN PART**. It is granted with respect to the Union's failure to grieve Mr. Mitchell's working conditions with Sycamore, with respect to Mr. Mitchell's claim that the Union itself

created a racially hostile work environment, and with respect to Mr. Mitchell's state-law claims.

In all other respects, the motion is denied.

09/07/2010

                                                 Hon. Jane Magnus-Stinson, Judge
                                                 United States District Court
                                                 Southern District of Indiana

**Distribution via CM/ECF only:**

William R. Groth
FILLENWARTH DENNERLINE GROTH & TOWE LLP
wgroth@fdgtlaborlaw.com

Robert Peter Kondras Jr.
HUNT HASSLER & LORENZ LLP
kondras@huntlawfirm.net

Craig Morris McKee
WILKINSON GOELLER MODESITT WILKINSON & DRUMMY
cmmckee@wilkinsonlaw.com